# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

MARK S. TIDMAN and )
EVELYN J. TIDMAN, )
           )
    Plaintiffs/Appellants, )
           )   Appeal No.
           )   01-A-01-9708-CV-00380
VS. )
           )   Davidson Circuit
           )   No. 97C-176
THE SALVATION ARMY, )

JAMES R. WORTHY, BERTHA )
WORTHY, KENNETH E. BREWER, )
FRED RUTH, )
           )
    Defendants/Appellees. )

FILED

July 15, 1998

Cecil W. Crowson
Appellate Court
Clerk

## APPEALED FROM THE CIRCUIT COURT OF DAVIDSON COUNTY
### AT NASHVILLE, TENNESSEE

### THE HONORABLE WALTER C. KURTZ, JUDGE

LARRY L. CRAIN
101 Westpark Drive, Suite 250
Brentwood, Tennessee 37027
    Attorney for Plaintiffs/Appellants

L. GINO MARCHETTI, JR.
WILLIAM G. MCCASKILL, JR.
TAYLOR, PHILBIN, PIGUE, MARCHETTI
  & BENNETT, PLLC
One Union Street
P.O. Box 198169
Nashville, Tennessee 37219-8169
    Attorneys for Defendants/Appellees

AFFIRMED AND REMANDED

BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J., M.S.
CAIN, J.

## OPINION

Two former Salvation Army officers, a husband and wife who had been demoted and discharged, sued their superior officers and The Salvation Army itself for invasion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress, and outrageous conduct. The Circuit Court of Davidson County dismissed the complaint for failure to state a claim upon which relief can be granted. We affirm, and hold, in addition, that the defendants' actions were protected by the First Amendment to the United States Constitution.

I.

The plaintiffs, Mark and Evelyn Tidman, were commissioned as lieutenants in The Salvation Army's Southern Territory. After serving at community centers in Birmingham and

Selma, Alabama, the Tidmans were transferred to Nashville under the command of Major James Worthy and his wife, Major Bertha Worthy.

The following facts are alleged in the complaint. We recite them as if they were true, as we are compelled to do in ruling on the motion to dismiss. *Cornprops v. Sloan*, 528 S.W.2d 188 (Tenn. 1975). We hasten to add, however, that they are only allegations.

Prior to coming to Nashville, Mr. Tidman had sought and received permission to attend outside counseling for a personal problem, under The Salvation Army's medical coverage. Shortly after arriving in Nashville, Mrs. Tidman was approached by Bertha Worthy regarding a rumor about Mr. Tidman. Mrs. Worthy assured Mrs. Tidman that she was acting as Mrs. Tidman's pastor and that the details discussed "would not leave the room." Relying on these assurances, Mrs. Tidman confided to Mrs. Worthy that her husband had confessed once to having an extramarital affair. Mrs. Worthy then recommended that the Tidmans meet with her and her husband the next day. During this meeting, Major James Worthy assured the Tidmans that they were speaking confidentially and that he was acting in a pastoral capacity. However, Mr. Worthy berated and interrogated Mark Tidman in an accusatory manner; he demanded a confession about the affair from Mark Tidman; and he stated the only way for Mr. Tidman to save face was to resign. Mr. Tidman refused

to confess, answering only that he had told his wife everything she needed to know and that they were committed to marriage counseling.

At about the same time, Edward Laity, The Salvation Army's Territorial Counselor in Atlanta, contacted Mr. Tidman's outside counselor, seeking to discover the details of the counseling sessions.

In November of 1995, Kenneth Brewer, The Salvation Army's Divisional Commander, told Mrs. Tidman's father of the rumor that Mark Tidman was engaged in an ongoing affair. Mrs. Tidman's father confronted Mrs. Tidman about the allegation. Mr. Brewer's motivation was allegedly to cause a rift in the Tidman family, to inflict severe emotional injury on Mark Tidman, and to cause him to resign.

In January of 1996, Fred Ruth, the Director of Personnel for The Salvation Army, summoned the plaintiffs to a meeting in Nashville, by falsely representing to them that the purpose of the meeting was a personnel interview. Instead, the Tidmans were confronted by Mr. Ruth, Major Brewer, and Major James Worthy, who, again, tried to coerce Mr. Tidman into confessing his infidelity. In the

- 4 -

meeting, Mr. Ruth revealed that he had learned of Mr. Tidman's past history of pastoral counseling from Mr. Laity.

Mr. and Mrs. Tidman were later dismissed from their positions in The Salvation Army and were told to vacate their living quarters in two days. Mr. Ruth disclosed to Mrs. Tidman's father the details of the January meeting.

II.

The Tidmans sued James and Bertha Worthy, Kenneth Brewer, and Fred Ruth for invasion of privacy, intentional and negligent infliction of emotional distress and outrageous conduct. They named The Salvation Army itself on the theory of respondeat superior.

The defendants filed a motion under Tenn. R. Civ. P. 12 to dismiss the action because (1) the defendants' actions were protected by the First and Fourteenth Amendments to the United States Constitution and (2) the complaint failed to state a claim upon which relief could be granted. The trial judge, in a written opinion, held that the factual record would not support a conclusion that the religious freedom clauses of the United States Constitution protected

the defendants. But the trial judge did hold that the complaint failed to state a claim under any of the theories advanced by the plaintiffs.

## III.

### Invasion of Privacy

Although the Tennessee courts earlier recognized the tort of invasion of privacy, *Martin v. Senators, Inc.*, 418 S.W.2d 660 (Tenn. 1967), this court more recently adopted Sec. 652A of the *Restatement (Second) of Torts* as the basis for the action. *Major v. Charter Lakeside Hosp.*, Shelby Law No. 42, filed at Jackson, Aug. 31, 1990. The Tidmans assert on appeal that their case falls within two of the *Restatement's* categories: (1) the public disclosure of private information (Sec. 652D), and (2) an unreasonable intrusion upon the seclusion of another (Sec. 652B).

The key to the first category is the word "public." In *Major*, we said that the *Restatement* required a disclosure to the public at large or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. *Major*, slip op. at *9. *See also Beard v. Akzona*, 517 F. Supp. 128 (E.D. Tenn. 1981).

The complaint does not allege that any private information was disclosed to anyone outside The Salvation Army command except Mrs. Tidman's father (who was himself a former officer in The Salvation Army). Therefore, the complaint does not state a cause of action under Section 652(D).

As to the unreasonable intrusion category described in Section 652(B), the Tidmans argue on appeal that the defendants "intruded into their personal and family solitude under the guise of pastoral counseling when their true motive was to inflict emotional suffering." We have read the complaint and cannot find the facts on which this conclusion could be based. The complaint does state that Mr. Laity advised Mrs. Tidman that she would be assigned to a new location if she decided to leave her husband. But, the complaint does not allege that the defendants tried to separate the Tidmans, or that the defendants set out on a deliberate quest to discover the intimate details of the Tidmans' marriage for no official purpose. The information sought by the defendants related to a fact that affected Mr. Tidman's ability to serve effectively as an officer in The Salvation Army, and all the alleged inquiries took place at work, within the official circle that had to make that determination.

This case is different from *Hester v. Barnett*, 723 S.W.2d 544 (Mo. App. 1987) where the complaint alleged that the Hester's

- 7 -

pastor "gained access to the Hester home through the pretense as counselor to assist in the correction of the children's behavior, when the true motive was to harm the Hesters by the disclosure of the information obtained through guile." 723 S.W.2d at 563. That allegation, taken as true, was considered by the court as sufficient to satisfy the three elements of a tort of invasion of privacy: (1) the existence of a secret and private subject matter; (2) a right in the plaintiffs to keep that subject matter private; and (3) the obtainment by the defendant of information about the subject matter through unreasonable means. 723 S.W.2d at 562.

For the reasons stated above, we do not think the allegations in the complaint satisfy any of these elements. A Salvation Army officer's claim that he has a right to keep his conduct secret must have a very limited scope when that conduct affects his ability to serve his religious employer. We will address in another part of this opinion the claim that the defendant used unreasonable methods to obtain this alleged private information.

IV.

Infliction of Emotional Distress/Outrageous Conduct

Although the complaint contains a claim for negligent infliction of emotional distress, all of the material allegations involve

the intentional, deliberate acts of the defendants. Therefore, we conclude, as the trial court did, that the complaint does not state a claim for negligence.

The intentional infliction of emotional distress and outrageous conduct describe the same tort. *Bain v. Wells*, 936 S.W.2d 618 n.3 (Tenn. 1997). The elements of the tort are: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury. *Id.* at 622. The defendant's conduct must be so extreme in degree as to go beyond all bounds of decency. *Medlin v. Allied Investment Co.*, 398 S.W.2d 270 (Tenn. 1966). The court's duty in the first instance is to apply these standards and to determine "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery . . . ." *Id.* at 275.

For the reasons we have already discussed, we are of the opinion that the trial judge was correct in concluding that the defendants' conduct did not rise to the actionable level.

V.

The Interference with the Counselor-Patient Relationship

We treat this subject separately because it is perhaps the most serious and because it relates to all of the wrongs alleged by the Tidmans.

In *Alberts v. Devine*, 479 N.E.2d 113 (Mass. 1985), the court found a sustainable cause of action against a minister's church superiors for inducing the minister's psychiatrist to reveal confidential information to them. In Part VI of this opinion we distinguish that case from this one. A further and perhaps more fundamental difference results from a close inspection of the Tidmans' allegations. The complaint only alleges that Mr. Laity sought confidential information from Mr. Tidman's therapist. It does not allege that he discovered anything. In addition, Mr. Laity's letter to Mr. Tidman's counselor is made an exhibit and it reads in part as follows:

> I do appreciate and respect the confidential relationship that must exist between counselor and counselee, and at no time would I want to intrude on that relationship. That same respect applies to your work with Captain Mark Tidman.
>
> My reason therefore for the telephone call several weeks ago and this letter is that some report is required by The Salvation Army which will help us to ascertain the active participation and the benefits received from the counseling process.
>
> There are several factors which we believe would give reason for requesting some response from you:

1. The individual receiving counseling is paying no personal funds to receive this benefit. The Salvation Army, in its care and concern for this officer is willing to cover all expenses connected with the sessions.

2. Any officer receiving such benefits understands that some basic information will be shared with my office. No confidential information is requested in this report.

3. In the case of Captain Tidman, he has been in counseling sessions with you since January of 1993 on a regular basis. Hopefully, some positive changes should have taken place during that time.

Now, having shared with me some aspects of his own life and the traumas which have severely affected him, I can well understand that the process of working through all of that must take time and great patience. Changes must occur internally and to expect radical change externally must be anticipated with forbearance and with some caution lest they exacerbate the emotional scars with which he is dealing.

From an administrative position, The Salvation Army is concerned that after this length of time, there seems to be little or no changes in his understanding of people and their needs, of working relationships, or his own interpersonal responses.

In your telephone message to me, you implied that The Salvation Army leadership needed to take whatever actions they deemed necessary in dealing with Captain Tidman. That stance on your part rather concerns me. Evidently Mark has shared much information with you regarding his feelings toward administration and his appointments. That is as it should be, however, he cannot be totally objective and none of us would be in like circumstances.

It is not my desire to share with you information that would bias your work with him, however

some information from you would help the leadership to know how to respond to him in the coming days.

I would appreciate your giving me at least the basic information on the attached report. In addition, some indication as to a future affirmative conclusion of the counseling process would be helpful. This will be held as confidential. If you desire to talk with Mark as to the contents of your report, we will be pleased to cover any expenses involved with that sharing.

Your timely response to this request is most appreciated.

We cannot find in the letter a request that the counselor reveal confidential information. In fact, the letter recognizes that the counselor cannot reveal information given in confidence, and it concludes by urging the counselor to discuss the information sought with Mr. Tidman. And, as we have pointed out, the complaint does not allege that any breach of confidence occurred.

VI.

Religious Freedom

The Salvation Army is a church for First Amendment purposes. *McClure v. The Salvation Army*, 460 F.2d 553 (5th Cir. 1972). By preventing the government from interfering with the free exercise of religion, the First Amendment limits the role of civil courts in resolving controversies that affect the church and its

- 12 -

members. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976). In matters involving "discipline, faith, internal organization, or ecclesiastical rule, custom or law" the civil courts are bound to accept the decisions of a religious organization. *Id.* at 713.

However, not all actions of church officials are free from state interference. *Presbyterian Church v. Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969); *Alberts v. Devine*, 479 N.E.2d 113 (Mass. 1985); *Bear v. Reformed Mennonite Church*, 341 A.2d 105 (Pa. 1975); *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766 (Okla. 1989). Some courts decide disputes involving religious organizations if they can be resolved by the application of "neutral principles" of law. *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo. 1993).

Most courts make a distinction between cases involving the religious order and its clergy and tort cases involving lay members. With respect to the employment of clergy, the courts are nearly unanimous in holding that the civil courts cannot "involve themselves in reviewing the termination of clergy for theological or disciplinary reasons." *Higgins v. Maher*, 210 Cal. App. 3d 1168 at 1170 (Cal. App. 1989). As the court said in *McClure v. The Salvation Army*,

> The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.

460 F.2d at 558-9. It is for this reason that the Tidmans voluntarily dismissed their claims based on the termination of employment. They recognized that The Salvation Army's determination of a sufficient reason for discharge is beyond the reviewing power of the courts. "[T]he supervisory power of the civil tribunals may not be invoked when the only property involved is the loss of clerical office and the salary incident thereto. *Watson v. Jones*, 80 U.S. 679 (1871).

Tort claims, however, do not enjoy the same degree of protection from state power. *See Alberts v. Devine*, 479 N.E.2d 113 (Mass. 1985); *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766 (Okla. 1989). In *Sherbert v. Verner*, 374 U.S. 398 (1963), the Supreme Court held that actions posing "some substantial threat of public safety, peace, or order" may be subject to governmental regulation even though prompted by religious beliefs or principles. 374 U.S. at 403. The intentional and malicious alienation of affection of one spouse from the other threatens public welfare and order and does not come within the protection of the First Amendment. *Hester v. Barnett*, 723 S.W.2d 544 (Mo. App. 1987). "Application of a secular standard to secular conduct that is tortious is not prohibited by the

Constitution." *Moses v. Diocese of Colorado*, 863 P.2d 310 at 320 (Colo. 1993).

There are cases however, in which the alleged torts occur in the course of the proceeding involving discipline of priest or pastor. In one case the court held that the torts alleged were "simply too close to the peculiarly religious aspects of the transaction to be segregated and treated separately -- as simple civil wrongs." *Higgins v. Maher*, 210 Cal. App. 3d 1168 at 1176 (Cal. App. 1989). In another, the court held that inducing a physician to breach his patient's confidence and divulge information to that patient's church superiors did not enjoy First Amendment protection. *Alberts v. Devine*, 479 N.E.2d 113 (Mass. 1985).

We are persuaded that this case is more like *Higgins*. Fuller quotes from that case follow:

> Higgins has pleaded the essential elements of the torts of invasion of privacy, defamation, and the intentional and negligent infliction of emotional distress. His pleading is plain and direct in terms of accusing the Bishop and other church hierarchy of unwarranted and malicious conduct which caused him severe damage. Had these allegations been set forth without the preamble showing their genesis in the priest-bishop relationship, it is doubtful they could have been dismissed on demurrer.

210 Cal. App. 3d at 1175.

> Regardless of the church's motives or objectives, or the circumstances giving rise, we would probably agree that torts such as battery, false imprisonment or conversion cannot be perpetrated upon its members with civil impunity. We find, however, that at least in the context of Higgins's averments, the torts recited are simply too close to the peculiarly religious aspects of the transaction to be segregated and treated separately -- as simple civil wrongs. The making of accusations of misconduct; the discussion of same within the order; the recommendation of psychological or medical treatment; the infliction, whether intentionally or negligently, of emotional distress -- these are all activities and results which will often, if not usually, attend the difficult process by which priestly faculties are terminated. If our civil courts enter upon disputes between bishops and priests because of allegations of defamation, mental distress and invasion of privacy, it is difficult to conceive the termination case which could not result in a sustainable law suit.

210 Cal. App. 3d at 1176.

In this case, all the allegations of wrongdoing involved conduct that occurred in the course of an investigation concerning Mr. Tidman's fitness to fill an office in The Salvation Army. This is a peculiarly ecclesiastical undertaking, and it involves The Salvation Army's beliefs and core values.

We hold that the complaint should have been dismissed on this ground as well.

- 16 -

The judgment of the trial court is affirmed and the cause is remanded to the Circuit Court of Davidson County for any further proceeding necessary. Tax the costs on appeal to the appellants.

------------------------------
BEN H. CANTRELL, JUDGE

CONCUR:

------------------------------
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION

------------------------------
WILLIAM B. CAIN, JUDGE

## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

| | |
|---|---|
| MARK S. TIDMAN and EVELYN J. TIDMAN, | ) |
| Plaintiffs/Appellants, | ) |
| | ) Appeal No. |
| VS. | ) 01-A-01-9708-CV-00380 |
| | ) |
| THE SALVATION ARMY, | ) Davidson Circuit |
| JAMES R. WORTHY, BERTHA WORTHY, KENNETH E. BREWER, FRED RUTH, | ) No. 97C-176 |
| | ) Affirmed and |
| | ) Remanded |
| Defendants/Appellees. | ) |

## JUDGMENT

This cause came on to be heard upon the record on appeal from the Circuit Court of Davidson County, briefs and argument of

counsel; upon consideration whereof, this Court is of the opinion that in the judgment of the trial court there is no reversible error.

In accordance with the opinion of the Court filed herein, it is, therefore, ordered and adjudged by this Court that the judgment of the trial court is affirmed. The cause is remanded to the Circuit Court of Davidson County for the execution of the judgment and for the collection of the costs accrued below.

Costs of this appeal are taxed against Mark S. Tidman and Evelyn Tidman, Principals, and Larry L. Crain, Surety, for which execution may issue if necessary.

                        -----------------------------------
                        HENRY F. TODD, PRESIDING JUDGE
                        MIDDLE SECTION

                        -----------------------------------
                        BEN H. CANTRELL, JUDGE

                        -----------------------------------
                        WILLIAM B. CAIN, JUDGE